## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| _____ ) | |
| Hit Doctor Tri State Arsenal, LLC.,      ) | |
|               Plaintiff,   ) | Civil No. 19-14579 (RBK/KMW) |
|     v.                  ) | |
|                     ) | **Opinion** |
| Joseph Barth, Jr., Hit Doctor New    ) | |
| Generation, Inc., and All American C.C.,  ) | |
|            Defendants.  ) | |
| _____ ) | |

**KUGLER**, United States District Court Judge

Before the Court in this trademark infringement action is a Motion for a Preliminary Injunction with Temporary Restraints ["the motion"] (ECF Doc. 3) filed by Plaintiff Hit Doctor Tri State Arsenal, LLC ("TSA" or "Plaintiff"), seeking to enjoin Defendants Mr. Joseph Barth, Hit Doctor New Generation, Inc., and All American C.C. (collectively "Barth" or "Defendants") from using TSA's licensed trademarks and/or confusingly similar marks in marketing to TSA's potential affiliates within the licensed territories.  On 24 July 2019, the Court held a hearing on the motion.  For the reasons set forth below, the motion is DENIED.  An Order bearing this date accompanies this Opinion.

## 1.0    Background and Legal Procedure

For at least 30 years, Mr. Barth conducted a business located in New Jersey that taught baseball tips and training at youth camps and sponsored travelling youth baseball teams, which competed successfully in regional and national competitions. Because of this business, Mr. Barth earned a reputation as a successful trainer and developer of baseball talent; he conducted this business largely but not exclusively throughout the Mid-Atlantic region, that is,

New Jersey, Pennsylvania, Delaware, New York and Maryland.

On 28 September 2017, plaintiff Hit Doctor Tri State Arsenal and defendants Barth and Hit Doctor New Generation, Inc. entered into an Asset Purchase Agreement ["APA"] that sold the assets of Mr. Barth's baseball training/coaching/development business ["the Business"], which included the tangibles of equipment and fixtures and the intangibles of the good will attributable to the business and the websites, www.hitdoctor.com and www.tristatearsenal.com. Other sold intangibles included any of the Business's social media platform web pages, such as Facebook, Twitter, and Instagram, and the Business credentials for accessing these. The APA also stated certain conditions precedent to the closure of the purchase, which were to occur on 13 October 2017 and comprised the execution of a Consulting Agreement and of a License Agreement between the parties.

The APA also contained a non-competition clause by which Barth and Hit Doctor New Generation, Inc. were constrained for two years after the termination of the Consulting Agreement from directly or indirectly competing in the Region against plaintiff in activities similar or related to the Business. Put directly, they were expressly constrained from engaging in baseball coaching, recruiting or related services. The APA Background appears to identify the following states as the Region: Maryland, Pennsylvania, Delaware, New Jersey, New York, Connecticut, and Florida.

On 13 October 2017, at the closing of the APA, the parties executed an amendment in writing to the APA as well as the required License Agreement, and the required Consulting Agreement. The APA amendment set forth the purchase price of the Business as $1,060,000, allocated as $1,000,000 for the intangibles and $60,000 for the tangibles. It also changed the

non-competition period to 9 months after the termination of the Consulting Agreement.

In the License Agreement, Defendant Barth granted to plaintiff an exclusive, perpetual, royalty-free, and non-cancelable license to use Barth's trademarks listed in Schedule A in the Licensed Territory, the same as the Region stated in the APA. Schedule A of the License Agreement lists these 3 marks: the Hit Doctor having Serial No. 75871575;[1] Tri-State Arsenal, having Appl. No. 87384238; and Arsenal Baseball, having Appl. No. 8737982.[2] To be clear, the License Agreement precluded the Licensor's, that is, Mr. Barth's, use of the licensed marks in the Region.

In the Consulting Agreement, plaintiff retained Mr. Barth as an independent contractor to provide the following services in the Region (same as stated above): training plaintiff's coaches, evaluating players, helping plaintiff to obtain sub-licensees in the Region, and giving lessons to plaintiff's baseball players or teams. The Consulting Agreement contained the same non-competition restrictions as in the amended APA.

On 1 July 2019, plaintiff filed a verified complaint (ECF Doc. 1) pleading: Count 1, willful trademark infringement against all defendants; Count 2, breach of the Licensing Agreement against Barth; Count 3, tortious interference by All American C.C.; Count IV, fraud against Barth and Hit Doctor New Generation, Inc.; Count VI, breach of the Consulting agreement against Barth; Count VII, trade secret theft against Barth, Count VIII, cybersquatting against

---

[1] The Hit Doctor mark is a registered in the US Trademark Office as a fanciful service mark, consisting of words and logo, as



pictured here.
[2] Neither the Tri-State Arsenal mark nor the Arsenal Baseball mark is registered but each was applied for as a service mark having standard characters.

Barth.

On the same day, plaintiff also filed this motion seeking to enjoin defendants from:

-continuing to compete with plaintiff *contra* the APA;

-infringing on the "goodwill" purchased by plaintiff in the APA;

-utilizing the licensed marks—The Hit Doctor, Tri-State Arsenal, and Arsenal Baseball—in the Licensed Territory (the Region) *contra* the License Agreement;

-using any mark that implies or confuses the public regarding Mr. Barth's affiliation with plaintiff;

-using marketing images or artwork sold to plaintiff in the executed Agreements; and

-using any confusing website domain names.

On 24 July 2019, the parties personally argued the motion before the Court, which ordered the parties to participate in a settlement discussion with Magistrate Judge Williams, which they did in person on 7 August 2019. Through September and October 2019, the parties continued to participate in meet and confers regarding settlement and to consider and identify a possible mediator.  Also, during this period, Magistrate Judge Williams held status telephone conferences to determine the parties' movement toward settlement. On 8 October 2019, the parties personally appeared before Judge Kugler in a status conference.  On 19 November 2019, in a telephone status conference call with Magistrate Judge Williams, the parties explained that neither a settlement nor an agreement to mediate the case would be forthcoming, which prompted the resolution of this motion.

**2.0    Parties' Contentions**

**2.1    Plaintiff**

Regarding the trademark infringement and breach of contract, plaintiff avers that, on 24 June 2019, Mr. Barth sent out an email blast to potential licensees of Mr. Barth's services, which stated Tri State Arsenal is a "national powerhouse and the top program in the Mid-Atlantic region" (ECF Doc. 3-1:9) and that "[w]e are now looking to expand nationally and encourage other established travel programs to join our Tri-State Arsenal USA Family."   The email also clarified that joining the Tri-State Arsenal USA Family as a licensee bore no up-front costs and came with a guarantee of a revenue stream that would exceed the licensing fees.  *Id.*

The next day, plaintiff's agent was telephoned by a recipient of the email blast who was located in Morris County, New Jersey and was interested in learning more about the advertised Tri-State Arsenal program.  *Id.*  at 10.   Further, on 27 June 2019, the same recipient sent plaintiff's agent a blast voice message, received as a robocall from Mr. Barth.  Three other players on a scout team of plaintiff's received the same robocall message, which stated that the recipient could attend the biggest event of plaintiff's summer baseball schedule with Mr. Barth for free if they stopped doing business with plaintiff and signed up with Mr. Barth for free.  *Id.*

Plaintiff argues the email and robocall blast demonstrated trademark infringement because they created likelihood of confusion as to the source of the marketing offers. Specifically, confusion arises because of the similarity between the "Tri State Arsenal USA" trademark Defendants used and "Tri State Arsenal", a licensed mark of which Plaintiff has exclusive use.   Put simply, plaintiff argues potential licensees of plaintiff become confused as to who solicited them online within the Region to become Defendants' licensees, which

solicitation bore similar marks as plaintiff's.  ECF Doc 3-1:15. Plaintiff argues without a temporary restraining order defendants will continue to use the confusing marks in the Region and confuse plaintiff's potential customers.  *Id*.; ECF Doc. 17:7.

Plaintiff further avers that such online marketing of baseball licenses within the Region breached all three agreements between the parties, and specifically violated the exclusivity granted in the License Agreement and the non-competition term of the amended APA and the Consulting Agreement.  ECF Doc. 3-1: 20.

As for violation of the Anti-Cybersquatting Consumer Protection ("ACPA)", plaintiff contends that defendants' use of the domain names www.tri-state-arsenal-usa.com and www.tristatearsenalusa.com are confusingly similar to both the licensed mark "Tri State Arsenal" and to the domain address www.tristatearsenal.com plaintiff bought in the APA.  ECF Doc. 3-1:2. Plaintiff further asserts defendants' use of these domain names on defendants' social medial websites and in email to solicit potential licensees necessarily creates confusion as to the identity of the solicitor, especially as social media websites lack fixed geographic boundaries and ordinarily do not limit solicitation within any particular Region.  *Id.*

Plaintiff's complaint alleges the attempts by defendant All American C.C. to canvas financial support to build a baseball tournament facility in southern New Jersey to be a breach of the non-competition clause of the APA.   ECF Doc. No. 1: ¶¶22-25.

As for its irreparable harm argument, plaintiff's essential argument is that defendants' online advertising in the Region constitutes irreparable harm because it confuses potential customers as to the source of the marketing.  ECF Doc. No. 17: 7.  Plaintiff also cites the APA, which states the parties acknowledge a breach of this agreement will constitute irreparable

harm. ECF Doc. No. 3-1:20.

**2.2    Defendants**

Defendants contend the use of websites and online social media, even if created in and launched from New Jersey, can be viewed by potential licensees anywhere in the world.  They acknowledge the APA unfortunately provides no guidance on how to solve this obviously fundamental problem, namely, that both parties may inadvertently solicit in their <u>respective unlicensed Region</u> merely by the presence of social media websites and their respective websites, which may contain an email address.  ECF Doc. 16: 2-3.

Thus, it is defendants' contention that if plaintiff regards defendants' use of its websites and social media platforms a breach of the License Agreement and trademark infringement because of the international reach of such media, then likewise plaintiff, by virtue of its engaging in precisely the same practice, must necessarily be breaching the License Agreement and infringing Defendants' marks outside the Licensed Region.  *Id.*

Defendants also contend the mark "Tri-State Arsenal USA" is a separate trademark owned by Barth and NGHD, which plaintiff did not license.  Therefore, defendants argue plaintiff's seeking to enjoin defendants' legitimate use of its legitimate trade mark is an improper attempt to take over more intellectual property than plaintiff bargained or paid for. *Id* at 9.

Defendants aver that plaintiff has breached all three agreements by signing up a licensee in North Carolina.  Defendants further aver that none of the agreements was amended <u>in writing</u> to expressly modify the Licensed Territory by substituting North Carolina for Connecticut.  ECF Doc. 16:6. They therefore contend plaintiff's securing a licensee in North

Carolina breaches all of the parties' agreements.  *Id.*  at 9.  Defendants Barth and NGHD also aver that plaintiff breached the Consulting Agreement by failing to pay defendants the bonus they had earned in performing their obligations under that Agreement.  *Id.* at 7.

Lastly, Defendants declare, in order to seek equitable relief, plaintiff must come to the court with clean hands and that plaintiff cannot do so.   Defendants aver plaintiff intentionally lied to vendors, potential licensees, and others that Mr. Barth had retired from the national Arsenal licensing program.  *Id.* at 8.   Further, they state plaintiff's lie was expressed to reduce competition mounting from Mr. Barth's continued involvement in baseball training programs outside the Licensed Territory. Therefore, since plaintiff has acted with bad intent to divert business from defendants to itself, it cannot now seek equitable relief.

**3.0    LEGAL STANDARD**

**3.1    Jurisdiction**

As a preliminary matter, this Court exerts subject matter jurisdiction under the federal trademark statute (the Lanham Act) at 15 U.S.C. §1121 to resolve the TRO motion to enjoin temporarily defendant's use of plaintiff's licensed trademarks in the licensed territory.

Defendant Barth's domicile is in New Jersey. Defendant, Hit Doctor New Generation, Inc. ("HDNG") is a New Jersey corporation, having its headquarters and business address in Erial, NJ.  The Court therefore exercises general, personal jurisdiction over them.

Defendant, All American C.C. ("All American"), is a Wyoming corporation having a business address of 6 Bicentennial Court, Erial, NJ 08081.  The Supreme Court recently clarified " '[a] court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are

so 'continuous and systematic' as to render them essentially at home in the forum State.' "

*Daimler AG v. Bauman*, 571 U.S. 117,127, 134 S.Ct. 746, 754 (2014) [internal citations omitted].

The *Daimler* Court has also noted, when an out-of-state defendant corporation's principal place

of business is within the State, then a district court in that State may exercise general

jurisdiction. *Id. at 129, 756 citing Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 780, n. 11, 104

S.Ct. 1473, 79 L.Ed.2d 790 (1984). Since All American C.C.'s principal and only place of

business address is in New Jersey, it is essentially "at home" there. Due process considerations

therefore support this Court's general jurisdiction over Defendant All American C.C.

**3.2     Temporary Restraining Order [TRO] Standards**

*Federal Rule of Civil Procedure* ("Fed. R. Civ. P." or "Rule*") 65(b)* authorizes a court to issue

a temporary restraining order when "there is a possibility that irreparable injury will occur

before the hearing on a preliminary injunction required by *Rule 65(a)* can be held." *Northeastern*

*Lumber Mfrs Assn. v. Sky of New York Corp.*, No. 16-9487, 2016 WL 7491903, at *2 (D.N.J. 29 Dec

2016) [*quoting Int'l Foodsource, LLC v. Grower Direct Nut Co.*, No. 16-3140, 2016 WL 4150748, at

*6 (D.N.J. 3 Aug 2016) [citations omitted]. The grant or denial of a temporary restraining order

or a preliminary injunction[3] is extraordinary relief "within the discretion of the Court" (*Fed'n of*

*State Massage Therapy Boards v. Acad. of Oriental Therapy, LLC*, No. 13-06317, 2013 WL

5888094, at *1 (D.N.J. 28 Oct 2013) [*citing American Exp. Travel Related Services, Inc. v.*

*Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012)]and "should be granted only in limited

circumstances." *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014)

---

[3] The standards for both a TRO and preliminary injunction are the same (*Univ. of Tex. v. Camenish*, 451 U.S. 390, 395 (1981))
See *Int'l Foodsource*, 2016 WL 4150748, at *6 (internal quotation marks omitted) for this Court's confirmation.

[*quoting Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)]. Injunctive relief is inappropriate "when the moving party has an adequate remedy at law." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (internal quotation marks omitted).

Specifically, to secure such extraordinary relief, the petitioner bears the burden of demonstrating in either a TRO request or motion for preliminary injunction[4]: (1) the likelihood of success on the merits; (2) likelihood that denial will result in irreparable harm; (3) the balancing of harms tips in petitioner's favor, in other words, that granting the injunction will not result in irreparable harm to defendant[s]; and (4) granting the injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20; 129 S.Ct. 365, 374; 172 L.Ed. 2d 249 (2008); *see Maldonado v. Houstoun*, 157 F.3d 179, 184 (3d Cir. 1998), *cert. denied*, 526 U.S. 1130 (1999) [as to a preliminary injunction] *and Ballas v. Tedesco*, 41 F. Supp. 2d 531, 537 (D.N.J. 1999) [as to temporary restraining order].

Petitioner's failure to establish any element renders the requested injunctive relief inappropriate. *NutraSweet Co. v. Vit–Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir.1999). All four factors must favor preliminary relief. *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990). In considering whether petitioner is entitled to such relief, the court may properly take into account both the plaintiff's verified complaint and supporting affidavits. *See Bascom Food Prods. Corp. v. Reese Finer Foods, Inc.*, 715 F.Supp. 616, 624 n. 14 (D.N.J. 1989).

---

[4] Except a preliminary injunction petitioner must show actual success on the merits. See *Univ. of Tex. v. Camenish*, 451 U.S. at 395.

However, since these factors are to be balanced against one another, not all factors need be considered, if the Court finds some factors not dispositive. *Mon Cheri Bridals, LLC v Bowls*, No. 14-8107, 2015 WL 1383948 at \*2 (D.N.J. 25 Mar 2015).  Especially dispositive are a likelihood of success on the merits and a likelihood of irreparable harm; and an injunction shall not issue absent a showing of these.  Winters, 555 U.S. at 22, 129 S.Ct. at 375-376; *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 90–91 (3d Cir. 1992).  A Court does not issue preliminary injunctive relief simply to prevent the possibility of some remote future injury as that is inconsistent with the Supreme Court's characterization of such relief as an extraordinary remedy awarded only upon a clear showing that plaintiff is entitled to it.  *Winter*, 555 U.S. at 21; 129 S.Ct. at 376 [*citing Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (*per curiam*)].

Because of their short duration mandated by *Rule 65(b)(2)*, decisions regarding temporary restraining orders have been found not appealable under *28 U.S.C. §1291(a)(1)*. *Vuitton v. White*, 945 F.2d 569, 573 (3d. Cir. 2001) [*quoting* 11 Wright & Miller *Federal Practice and Procedure §2962* at 628 (1973 & Supp. 1991)].[5]

### 3.3    TRO Standards Applied in Trademark Infringement and Cybersquatting

### 3.3.1   Likelihood of Success on the Merits and Irreparable Harm

Since both trademark infringement and anti-cybersquatting actions arise under the Lanham Act (although under different sections) likelihood of success on the merits for both counts generally requires a showing that defendants' use of the mark in commerce or as a

---

[5] On the other hand, a preliminary injunction, as an interlocutory order under *28 U.S.C. 1292 (a)(1)*, is appealable. *W.S. Intern, LLC v. M. Simon Zook, Co.*, 566 Fed. Appx. 192, 195 (3d Cir. 2014).

domain name likely created confusion as the source of the goods/services solicited.

To confirm likelihood of success on the merits of its trademark infringement claim, the plaintiff TSA must show three things:   it "owns" valid and legally protectable marks; defendants used the marks in commerce; and such use will likely cause confusion as to the source, affiliation, and/or sponsorship of the goods. *Chanel, Inc. v. Matos*, 133 F. Supp. 3d 678, 684-85 (D.N.J. 2015) [internal quotation marks omitted].  *See also American Bridal & Prom Industry Association, Inc., et al.*, v. *JollyProm.com, et al.*, No. 17-2454, 2018 WL 1226106 at *2 (D.N.J. 9 March 2018) [finding a showing of trademark infringement in a TRO context].   In other words, TSA must show Barth's use of a substantially similar mark for similar baseball training/ coaching/ development services caused a likelihood of confusion as to the source of those services.  *KOS Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 708-79 (3d Cir. 2004) [*citing A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 210 (3d Cir.2000)]; *Chanel, Inc. v. Gordashevsky et al.*, 558 F.Supp.2d 532, 536 (D.N.J. 2008).

In this Circuit, the determining standard for competing goods or services differs from that for non-competing ones.[6] " '[W]here the trademark owner and the alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself' ".

---

[6] For non-competing goods/services, in this Circuit courts determine likelihood of confusion by reviewing a non-exhaustive list of factors ["the Lapp factors"], which include:
(1) degree of similarity between the owner's mark and the alleged infringing mark;
(2) strength of the owner's mark;
(3) price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
(4) length of time defendant has used the mark without evidence of actual confusion arising;
(5) intent of the defendant in adopting the mark;
(6) evidence of actual confusion;
(7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;
(8) extent to which the targets of the parties' sales efforts are the same;

*A & H Sportswear*, 237 F.3d at 202 [*quoting Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir.1983)).

Previously, the Third Circuit had held irreparable injury is presumed in trademark infringement actions. *Kos Pharm,* 369 F.3d at 726 *stating* "[t]rademark infringement amounts to irreparable injury as a matter of law."  However, in light of *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392-93 (2006),[7] the Third Circuit reworked its position to hold no presumption of irreparable harm is afforded to parties seeking injunctive relief in Lanham Act cases.  *Ferring Pharm.*, 765 at 216.  *See also Buzz Bee Toys, Inc. v. Swimways Corp.*, 20 F. Supp. 3d 483, 511-12 (D.N.J. 2014) *stating* "after *eBay*, irreparable harm must be established as a separate element, regardless of whether a plaintiff has shown infringement."  Thus, in the Third Circuit, irreparable harm caused by the trademark infringement must be shown and is not presumed.

### 3.3.2   Balancing the Harms and the Public Interest

If a plaintiff shows both a likelihood of success on the merits and irreparable harm, the Court may in its sound discretion determine whether all four factors must be reviewed or if, taken together, these two factors balance in favor of granting the relief sought.  *Fulton v. City of Philadelphia*, 922 F.3d 140, 152 (3d Cir. 2019). Specifically, that balancing weighs whether

---

(9) relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;
(10) other facts suggesting the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.
*Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir.1983), as modified by *A & H Sportswear*, 237 F.3d at 212.  *See, e.g., AstraZeneca AB v. Dr. Reddy's Laboratories, Inc.*  145 F.Supp. 311, 315-318 (D. Del. 2015) for a thorough review of the *Lapp* factors in determining trademark infringement in an opinion deciding a temporary restraining order.
[7] In which the Supreme Court held that in patent cases irreparable harm is not presumed when there has been a showing of likelihood of success on the merits

the injury likely to the plaintiff is greater than that likely to the defendant. *See, e.g.*, *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 129 F.Supp.2d 351, 368 (D.N.J. 2001); *Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222 (3d Cir. 1990) [both exemplifying the balancing of whether irreparable harm to defendant supports a showing of no irreparable harm to plaintiff].   In a Lanham Act dispute, the most basic public interest is the prevention of confusion, particularly as it affects the public interest in truth and accuracy.  *AstraZeneca*, 145 F.Supp. at 320 [*citing Kos Pharmaceuticals*, 369 F.3d at 730].

**3.4      Anti-cybersquatting Protection Act ["ACPA"]**

The ACPA, enacted in 1999 as part of the Lanham Act at 15 U.S.C. § 1125(d), established a cause of action for registering, trafficking in, or using a domain name confusingly similar to, or dilutive of, a trademark or personal name.  To succeed on an ACPA claim, plaintiff TSA must show: (1) its licensed marks are distinctive or famous; (2) defendants' domain names are identical or confusingly similar to plaintiff's licensed marks; and (3) defendants registered its domain name with bad faith intent to profit from them. *15 U.S.C. § 1125(d)(1)(a)*; *Mayflower LLC v. Prince*, 314 F.Supp.2d 362, 367 (D.N.J. 2004) [*citing Shields v. Zuccarini,* 254 F.3d 476, 482 (3d Cir.2001)].

**4.0      Discussion**

**4.1      Generally**

To state the very obvious, this matter is about a deal gone bad.   The Court notes parties' pronounced discontent with the deal stems from the inadequacy of the agreements between them, which in no way considered the real nature of the property being exchanged or

the international reach of email, websites, and social media sites. The APA, the License Agreement, and the Consulting Agreement all divvy up a distinct and separate region of the country within which each party is intended to use the exchanged property.  However, the agreements divvyed up the exchanged property as if it were apartment buildings or car dealerships or donut franchises, that is, tangible things or services that can in fact be regionalized.   But regionalized property wasn't what was exchanged: it was trademark use within an exclusive region.  Better said, the agreement intended to divvy up the use of the **same trademarks and the same brands** within exclusively different regions.

The agreements spelled out that plaintiff would operate its baseball camps and other baseball education and events within the region where Mr. Barth had previously done much of his former business.  Since almost all of the "property" exchanged in the APA is the goodwill attached to Mr. Barth's successful operations for over 30 years, the agreements mapped out plaintiff's purchase of a business well-branded within Mr. Barth's **previous** region.

Unfortunately, the agreements did not consider the "boundary less -ness" of internet marketing and did not spell out how the parties' internet marketing of the **same trademarks for the same services must be limited to** within exclusively separate regions **online**.  Put differently, the aim of the deal—a grant of the use of the same marks for the same services in separate regions—would have been better structured as the **regionalized use <u>right</u> of a brand**. That is, had the agreements been skillfully and purposively drafted to limit each party use right of the internet to market only within its licensed region, the deal may not have soured.

But since the deal lacks contractually limiting obligations regarding internet marketing, the parties' internet solicitations inevitably, and perhaps even at the beginning inadvertently,

encroached into each other's regions.  How could likelihood of confusion as to the source of an internet solicitation <u>not</u> occur under such troubled agreement drafting?

## 4.2    Likelihood of Prevailing on the Merits

As stated earlier, neither licensed word mark—Tri-State Arsenal or Arsenal Baseball— has been registered in the U.S. Patent and Trademark Office ["USPTO"], which leaves plaintiff incapable of meeting prong 1 of the trademark infringement standard, namely, a valid and legally protectable mark.  This is because the USPTO prosecution history of each mark shows Mr. Barth claimed use in commerce for each as early as 1 June 1999.  By the end of December 2017, the application for each mark was abandoned in the USPTO  for failure to respond to an Office Action, which cited at least one non-U.S., registered mark as prior art.[8]  Although Mr. Barth had been using these marks in commerce for presumably over 20 years, which could under certain circumstances provide him with prior use rights in some or all portions of the United States, his failure to attain registration because of cited prior art creates the presumption the abandoned marks are invalid[9] inasmuch as the owner of the prior art registered marks  could sue Mr. Barth for infringement.   This presumption of invalidity has not been rebutted.

---

[8] The Court notes that plaintiffs have filed in the USPTO their own application, U.S. Ser. No. 88365505, for the design mark



, which is currently under prosecution.

[9] In well-established trademark practice, such presumption of invalidity can be defeated by creating a concurrent use agreement with the prior art mark owner, which "carves" out a territory of licensed use, e.g., the United States.   But, that was not done here for either mark.

As for the licensed, design mark , the plaintiff has not provided evidence of defendants' infringing use either in commerce or as a domain name. Schedule A of the License Agreement is determinative here and confirms plaintiff did not license a registration, application, or common law designation for a mark having only standardized letters, to wit, "Hit Doctor" but rather a registration for only the design mark above.

Plaintiff appears to have equated defendants' use of the text mark "Hit Doctor" with use of the design mark. To be clear, Mr. Barth in the past had registered the text mark "Hit Doctor" in the USPTO. That registration 3480355 is now cancelled for failure to pay certain maintenance fees. Nonetheless, that the text mark "Hit Doctor" had been registered coupled with defendants' continuous use of it gives defendants' common law rights in the mark, which are arguably national and which were not licensed to plaintiff.

Plaintiff evidences neither its exclusive rights to the text mark "Hit Doctor" in the Licensed Region nor defendants' use of the design mark  in commerce or as a domain name. Since plaintiff cannot demonstrate trademark infringement of the design mark, plaintiff cannot demonstrate anti-cybersquatting.

## 4.3    Irreparable Harm

Plaintiff relies on the terms of the Asset Purchase Agreement, which stated that the parties agreed breach of this agreement would constitute irreparable harm, necessitating equitable relief. Just because a contract includes this term doesn't bootstrap a contract breach into irreparable harm. The Third Circuit has demanded irreparable harm to a trademark

and its good will be evidenced. *Ferring Pharm.*, 765 at 216. The events that plaintiff alludes to in its submissions as irreparable harm include a single email blast by defendant and a single event of robocalling, which prompted recipients to ask plaintiff about the source of the email blast. ECF Doc. 3:1-14-15. The recipients' questioning to plaintiff implies likelihood of confusion but nonetheless does not establish trademark infringement because the marks are presumably invalid.

Plaintiff does not demonstrate that it lost potential customers by the email blast or the robocalling but implies only a possibility of losing customers in the future. Such a possibility does not rise to evidence of irreparable harm to the licensed mark and expired mark applications. *Winter*, 555 U.S. at 21 [*citing Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (*per curiam*)]. Plaintiff's assertions contend defendant's actions may constitute breach of their contracts, including the APA, the License, and the Consulting Agreement, which are remediable by damages and belie the need for equitable relief. *Winter*, 555 U.S. at 21.

At this point, since plaintiffs have shown neither likelihood of success on the merits nor irreparable harm, the Court may end the inquiry as suggested in *Fulton*, 922 F. 2d at 152. However, for the sake of completeness, the Court finds that, since plaintiffs haven't shown likelihood of success or irreparable harm, balancing the equities as well as considering the public interest means leaving the parties in their current state of dispute to resolve their breach of contract contentions or dissolve their business relationship.

**5.0     Conclusion**

For the reasons discussed above, the motion for a Preliminary Injunction with

Temporary Restraints is denied.

Dated:   11 February 2020                          s/ Robert B. Kugler
                                                    ROBERT B. KUGLER
                                                    United States District Judge